1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                 FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9   Leon H. Pogue,                           )   No. 1:07cv-01577-GMS
                                             )
10               Plaintiff,                   )   **ORDER**
                                             )
11   vs.                                      )
                                             )
12                                            )
     Dr. Igbinosa, et. al.,                   )
13                                            )
                 Defendants.                  )
14                                            )
     _____         )
15

16           Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 112).

17   For the reasons stated below, the motion is granted in part and denied in part.

18                              **BACKGROUND**

19           On January 6, 2006, Plaintiff Leon Pogue was transferred from Sierra Conservation

20   Center ("SCC") to Pleasant Valley State Prison ("PVSP"). (Doc. 113 ¶ 1). On that day, an

21   "Initial Health Screening" was conducted, which noted that Plaintiff had recently undergone

22   back surgery on his L 3, 4, and 5 disks, that he stated he had a torn left anterior cruciate

23   ligament ("ACL") for which he wore a knee brace, and that he "needs orthopedic consult

24   ASAP." (Doc. 118-1, Ex. A). Additionally, the screening indicated that Plaintiff used a cane,

25   glasses, and a back brace, that he needed a double mattress in his bunk, that he needed to be

26   on a lower bunk on a lower tier,[1] and that he needed a chair to take a shower. (*Id.*).

27   _____

28           [1] The lower tier can be accessed by inmates without going up a flight of stairs.

During his stay in SCC prior to being transferred to PVSP, Plaintiff had obtained prison-approved medical accommodations, or "chronos," entitling him to the equipment and rights detailed in the intake screening. (Doc. 113, Ex. A at 23: 10–16). His previous surgery had been a decompressive laminectomy and diskectomy; the surgery involved thinning portions of his vertebrae in order to reduce pressure on his nerves. (Doc. 118-16, Ex. WW). After the surgery, as a result either of the surgery, the pain medication, or a combination of the two, he "didn't have the same pain" for some months. (Doc. 106, Ex. A at 46:6).

On the day after his arrival, Plaintiff filled out a Health Care Services Request Form ("HCSRF") (Doc. 188-1, Ex. B). On the top of the form, he wrote "Emergency," and on the form he detailed his recent surgery and stated that he needed the pain medication he had been prescribed after the surgery. (*Id.*). Additionally, he stated that he needed to have his medical chronos from SCC transferred. (*Id.*). He concluded the request by writing "I need to see a Dr. now!" (*Id.*). The request was processed two days later, on January 9, 2006; on the form it is noted that the particular medication Plaintiff requested is not available, but a replacement had been ordered, and that an order for the chronos has been completed. The request was marked as "routine."[2] (*Id.*).

On January 16, Plaintiff submitted an "Inmate/Parolee appeal form," noting his recent back surgery and stating that PVSP had discontinued his pain medication after three days. (Doc. 118-1, Ex. C at APP 000374). He requested to see a doctor immediately and to be compensated $175,000. (*Id.*). On January 17, Plaintiff saw Dr. Hana, who noted the recent surgery and Plaintiffs' complaints of back pain. Contemporary medical records indicate that Plaintiff was prescribed pain medicine and include the statement "follow up with neurosurgery" with regards to the back issue. (Doc. 118-1, Ex. D). Plaintiff's January 16 appeal was partially granted at the informal level on February 20, when it was noted that he

---

[2] The form allows for three levels of priority: Emergency (immediately), Urgent (within 24 hours), and Routine (within 14 calendar days).

1   had been seen by a doctor within 14 days of his arrival, that pain medication had been

2   prescribed, and that his chronos had been ordered. (Doc. 118-1, Ex. C at APP 00374). On

3   February 26, Plaintiff appealed the informal response with a formal appeal, in which he noted

4   that he had not received follow-up care for his back or his torn ACL, and once again

5   requested $175,000. (*Id.*).

6       On March 27, Plaintiff was again seen by Dr. Hana, who noted that he should have

7   follow-ups with neurosurgery and sports medicine, and that Plaintiff had been instructed on

8   the use of his medication. (Doc. 118-1, Ex. F). On April 19, Dr. Hana partially granted

9   Plaintiff's formal appeal, noting that he had been seen on March 27, referred to the sports

10  medicine clinic, and proscribed Vicodin. (Doc. 118-1, Ex. C at APP 000373). The decision

11  also noted that Plaintiff had a number of accommodating chronos in place, including an

12  eggcrate mattress and cotton blanket on his bunk, the use of a cane, and exemption from

13  prolonged standing, walking, or sitting. (*Id.*). On April 30, Plaintiff once again appealed,

14  stating that he had not received adequate care, that his pain medication prescription had

15  expired, that his back pain was a chronic condition, and that the medical staff had been

16  deliberately indifferent to his serious medical needs. (*Id.* at APP 00375–76). This second-

17  level appeal was reviewed by Dr. Felix Igbinosa, who partially granted the appeal on May

18  25, 2006. Dr. Igbinosa noted that Plaintiff had seen Dr. Hana on March 27, had been

19  scheduled for an appointment with the sports medicine clinic on June 5, 2006, had a

20  prescription for Vicodin through July 1, 2006, and had a number of accommodation chronos

21  in place. (*Id.* at APP0372). In his deposition, Dr. Igbinosa stated that the response to the

22  appeal had been drafted by a healthcare appeals coordinator for his review, and that he did

23  not recall if he changed the draft provided to him before signing it. (Doc. 188-2, Ex. G-1 at

24  174:23–175:5). Plaintiff appealed Dr. Igbinosa's review to the director level. The director-

25  level appeal was denied on September 6, 2006, when the chief of the Inmate Appeals Branch

26  noted the findings of the previous reviewers, and added that PVSP's sports medicine

27  physician had cancelled his services at PVSP. As a result, all requests for sports medicine

28

1   were being reviewed for medical necessity or to determine whether the treatment could be

2   conducted by a primary care physician. (Doc. 118-1, Ex. C at APP 00370).

3           Dr. John Diep began working at PVSP in September of 2006. On October 12, 2006,

4   Plaintiff saw Dr. Diep. (Doc. 118-6, Ex. I). Dr. Diep noted Plaintiff's history of back surgery

5   and pain, and that a request for an MRI on Plaintiff's left knee had been made. (*Id.*). Dr. Diep

6   recommended a follow-up with neurosurgery, and prescribed pain medication. (*Id.*). In his

7   deposition, he stated that Plaintiff did not present symptoms requiring an emergency

8   designation, and that he did not order an MRI on Plaintiff's back because "a lot of people

9   always have back pain and always have straight to their legs [*sic*]." (Doc. 118-4, Ex. H-1 at

10  140:3–4). He stated that Plaintiff "ha[d] an appointment for a neurosurgeon or whatever, and

11  it seem[ed] like it [was] already in place, so I [told] him just follow up." (Doc. 118-4, Ex. H-

12  1 at 144:1–3). In his deposition, when shown a handwritten note Plaintiff had written to a

13  PVSP nurse requesting his pain medication, Dr. Diep stated that "all [inmates] love pain med

14  so they write everything" on their requests for medical care. (Doc. 118-4, Ex. H-1 at

15  85:10–12). He continued, stating that "they all want pain med, so sometime they write it

16  because they want—they want to make sure that the pain med doesn't run out. It doesn't

17  mean they [are] in pain, but they want to write it early. . . . They always want something.

18  Always want pain medicine." (Doc. 118-4, Ex. H-1 at 85:15–23).

19          On November 20, Plaintiff filed another HCSRF form asking that he see a doctor for

20  pain in his back and requesting that his pain medication be renewed. (Doc. 118-6, Ex. J). Dr.

21  Diep subsequently renewed Plaintiff's pain medication prescriptions on December 4,

22  December  6, and December 22. (Doc. 118-6, Exs. K, L, M). According to Dr. Diep, the

23  practice at PVSP was for a nurse to provide him with multiple prescriptions for renewal,

24  which he would then sign. (Doc. 118-6, Ex. H-1 at 60:5–9). Dr. Diep did not see Plaintiff,

25  and did not notice that he signed two prescriptions for thirty days worth of Vicodin two days

26  apart because "I have so many patient[s] I don't know which patient is not [*sic*]," and

27  because he did not keep track of how many orders he made for each patient. (Doc. 118-5, Ex.

28                                          - 4 -

1   H-2 at 172:15–17; 177:7–9).

2       At some point prior to January 5, 2007, the consultation request that Dr. Diep had

3   made on October 12, 2006 for Plaintiff to see a neurosurgeon was cancelled because such

4   appointments require that the patient have an MRI prior to being seen. (Doc. 118-6, Ex. N).

5   On January 5, 2007, Dr. Diep ordered an MRI to be performed on Plaintiff's lower back.

6   (Doc. 118-6, Ex. O). In his deposition, Dr. Diep confirmed that he did not see Plaintiff prior

7   to ordering the MRI, and had no recollection of why he ordered it. (Doc. 118-5, Ex. H-2 at

8   181–182). On January 25, Dr. Diep again saw Plaintiff, and noted his history of back pain,

9   and that he had a pending MRI on his left knee; the records indicate that Plaintiff was

10  suffering from lower back pain and that his pain prescription was renewed, but do not contain

11  any notation regarding the MRI for Plaintiff's back. (Doc. 118-6, Ex. P).

12      On January 29, 2007, an MRI was performed on Plaintiff's knee; it showed that his

13  ACL was intact but that he had a tear in the anterior horn of the lateral meniscus. (Doc. 118-

14  6, Ex. Q). On April 21, 2007, Plaintiff filed another HCSRF requesting medical care for the

15  tear in his knee, stating that he was in "unbearable pain," and asking that his chronos be

16  updated because he was unable to get down during alarms. (Doc. 118-8, Ex. W). On April

17  22, Plaintiff filed an appeal stating that his "mobility impaired vest," a vest which signals to

18  correctional officers that an inmate is not required to get down during prison alarms, had

19  been confiscated by prison authorities, and requesting that it be returned so that he could

20  remain standing or sitting on a bench during alarms. (Doc. 118-7, Ex. V at APP 000023). He

21  stated that the vest was confiscated because his accommodation chronos did not specifically

22  state that he could not get down during an alarm. (*Id.*). Plaintiff claims he had been originally

23  issued the vest because he had an accommodation chrono that stipulated "no bending," but

24  that when Ahlin arrived at PVSP, he instituted a policy whereby all mobility vests were taken

25  away unless the accommodation chrono specifically stated that an inmate could not get down

26  during an alarm. (Doc. 118-1, Ex. E at 74:25–76:9).

27      On May 4, 2007, Plaintiff was given an MRI on his lower back; the MRI showed that

28

there was lateral protrusion on three discs, significant pressure on the thecal sac, and narrowing of the neural canals on the right. (Doc. 118-6, Ex. S). On May 14, Plaintiff again filed an HCRSF, this time requesting that his accommodation chronos be updated to include specifically that he could not get down during an alarm, so that he could have his mobility vest returned. (Doc. 118-8, Ex. X). On May 18, Plaintiff met with Dr. David Smith regarding the knee injury; Dr. Smith recommended that Plaintiff undergo arthroscopic surgery. (Doc. 118-6, Ex. U).

On May 22, the prison warden, James Yates, issued a memorandum stating that mobility vests were only to be issued to inmates who "cannot become seated during an alarm." (Doc. 118-8, Ex. V at APP 00327). On May 23, Plaintiff again met with Dr. Diep; his medical records at the time state that he complained of lower back pain, and Dr. Diep renewed Plaintiff's medications. (Doc. 118-8, Ex. Z). The records do not indicate whether Dr. Diep discussed the MRI with Plaintiff, and in his deposition, Dr. Diep stated "I don't remember if I reviewed it or not." (Doc. 113, Ex. B at 225:22–23). Dr. Diep denied the request for a mobility vest, writing, "I believe he can get down slowly." (Doc. 118-8, Ex. Z). In his deposition, Dr. Diep stated that he would have written the notation if a patient could get down to a sitting position because during an alarm, "some of them sit down on the bench." (Doc. 113, Ex. B at 231:24–25). He further stated that when he said that a patient could "get down slowly" during an alarm, he meant "He doesn't have to get down fast. You can take one day, two days, I don't know." (Doc. 113, Ex. B at 235:12–15). On May 25, Plaintiff filed a Reasonable Modification or Accommodation Request ("RMAR"), asking again that his mobility vest be restored because he could not get onto the ground without aggravating his injuries. (Doc. 118-8, Ex. V at APP 00325). It is not clear from the record how many alarms went off while Plaintiff did not have his mobility vest or whether he went to a seated or prone position during any alarms that did go off.

On June 5, 2007, Dr. Kee Kim met with Plaintiff via telemedicine and reviewed the MRI of Plaintiff's back. Dr. Kim recommended "aggressive decompression and instrument

fusion" surgery. (Doc. 118-9, Ex. AA). On June 6, Plaintiff submitted another RMAR, requesting that he be transferred to a prison nearer to where the surgery would be conducted, and one in which more physical therapy would be available post-surgery. (Doc. 118-9, Ex. BB at APP 000032). The request was denied on July 6, 2007; the form states that medical transfers are only available to patients suffering from cancer, infected with HIV, or who require an oxygen tank. (*Id.* at AP 00033). Associate Warden John Ahlin approved the denial on August 2, 2007. (*Id.*).

On August 3, 2007, Dr. Kim performed the surgery at U.C. Davis. (Doc. 118-9, Ex. DD). On August 15, Plaintiff was seen by a nurse practitioner, who issued him a temporary mobility vest; his appeal for an accommodation chrono for a mobility impaired vest was granted on August 24. (Doc. 118-9, Exs. EE, FF; Doc. 118-7, Ex. V at APP 000019–20). On August 21, Plaintiff filed an appeal requesting a transfer to a facility where he could receive effective post-operative treatment for his surgery. (Doc. 118-9, Ex. GG at APP 000047). After a telemedicine appointment with Dr. Kim on September 11, 2007, Dr. Kim recommended that Plaintiff be transferred to a facility "due to [patient] needing physical therapy for proper healing." (Doc. 118-9, Ex. HH). Dr. Kim wrote a letter to Dr. Igbinosa on that day, recommending that Plaintiff be transferred to a prison where physical therapy is available. (Doc. 118-9, Ex. JJ). On November 13, Plaintiff's request for transfer to a medical facility was denied because such a request cannot be granted at the informal level; Plaintiff appealed to the formal level and the request was partially granted, to the extent that Plaintiff would be evaluated by a physical therapist at PVSP. (Doc. 118-9, Ex. GG at APP 00047–48). On January 31, 2008, Plaintiff was seen by a physical therapist and scheduled for therapy twice a week for four weeks. (Doc. 118-10, Ex. MM at UHR 000541). Dr. Igbinosa responded to Plaintiff's appeal for a transfer on March 6, 2008, stating that Plaintiff's medical needs were being met at PVSP. (Doc. 118-9, Ex. GG at APP 000046).

Surgery was performed on Plaintiff's left knee on July 12, 2008 by Dr. Smith at Corcoran District Hospital. (Doc. 188-10, Ex. KK). According to Plaintiff's expert, Dr.

1   Clement K. Jones, M.D., the fact that an MRI was not performed until eighteen months after

2   Plaintiff presented his complaint to prison medical staff in January of 2006 delayed his

3   eventual spine surgery and "contributed to a worsened overall outcome" in his medical

4   condition. (Doc. 118-21, Ex. FFF at 7). Furthermore, according to Dr. Jones, the act of

5   "getting down for an alarm," contributed to the worsening of Plaintiff's medical condition

6   over that time; as previously noted, there is no other evidence in the record as to whether or

7   not Plaintiff did in fact get all the way to the ground during alarms. (*Id.*). Dr. Jones further

8   stated that during the time his knee went without surgery, "he would have favored or avoided

9   weight-bearing on the affected left leg" which in turn would have worsened his spinal

10  condition. (*Id.*).

11          Plaintiff filed his complaint on October 29, 2007 and his Amended Complaint on

12  February 29, 2008. (Docs. 2, 15). In the complaint, he names Dr. Igbinosa, Warden Yates,

13  and Dr. Diep, along with various other prison officials, including Medical Appeals

14  Coordinator Brandon Price, Medical Appeals Coordinator H. Martinez, Associate Warden

15  Ahlin, Correctional Counselor I. Hickenbothom, and additional doctors Eherman and Phi.

16  (Doc. 15).

17          In the complaint, he alleges that Dr. Diep and Dr. Igbinosa violated his Eighth

18  Amendment rights by showing deliberate indifference to his serious medical needs when they

19  failed to provide him with an MRI of his back for eighteen months. He alleges that Warden

20  Yates, Associate Warden Ahlin, Counselor Hickenbothom and Coordinators Martinez and

21  Price were notified of his condition and took no action. He alleges that Dr. Ehrman denied

22  him pain medication. Dr. Phi is not mentioned in the body of the complaint. (Doc. 15).

23  Plaintiff was unable to serve Ehrman, Phi, or Hickenbothom, and they have been dropped

24  as Defendants. (Docs. 34–36). Defendants Yates, Igbinosa, Ahlin, Martinez, and Diep have

25  moved for summary judgment. (Doc. 112). Defendant Price subsequently moved to be joined

26  to the motion for summary judgment. (Doc. 121). Plaintiff has filed his opposition to the

27  joinder, and Defendants have replied that the joinder effort is "a motion to correct an

28

1 oversight by newly assigned counsel and no more." (Doc. 124). Neither party has requested

2 oral argument.

3 **DISCUSSION**

4 **I.    Legal Standard**

5          Summary judgment is appropriate if the evidence, viewed in the light most favorable

6 to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact

7 and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Substantive

8 law determines which facts are material and "[o]nly disputes over facts that might affect the

9 outcome of the suit under the governing law will properly preclude the entry of summary

10 judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[A] party seeking

11 summary judgment always bears the initial responsibility of informing the district court of

12 the basis for its motion," including identifying portions of the record that demonstrate the

13 absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

14 (1986).

15          Once the moving party has detailed the basis for its motion, the party opposing

16 summary judgment "may not rest upon the mere allegations or denials of [the party's]

17 pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

18 Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

19 586-87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995);

20 *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A moving party need not disprove

21 elements that the non-moving party will be required to prove at trial. Instead, "if [the non-

22 moving] party fails to make a showing sufficient to establish a genuine dispute of fact with

23 respect to the existence of that element, then summary judgment is appropriate." *Cal.*

24 *Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.

25 1987) (citing *Celotex*, 477 U.S. at 322–23). "A fact issue is genuine 'if the evidence is such

26 that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha*

27 *Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248).

28

1   Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only

2   by a finder of fact *because they may reasonably be resolved in favor of either party*.'" *Cal.*

3   *Architectural Bldg. Prods.*, 818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250; emphasis

4   in original). "[A]t the summary judgment stage the judge's function is not himself to weigh

5   the evidence and determine the truth of the matter but to determine whether there is a genuine

6   issue for trial." *Anderson*, 477 U.S. at 249.

7   **II.    Analysis**

8        The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor

9   excessive fines imposed, nor cruel or unusual punishments inflicted." U.S. CONST., amend.

10   VIII. Those whose Eighth Amendment rights have been violated may seek recovery in

11   federal court by bringing suit under 42 U.S.C. § 1983. Section 1983 does not provide for

12   traditional *respondeat superior* liability. Rather, "a supervisor is liable for the acts of his

13   subordinates 'if the supervisor participated in or directed the violations, or knew of the

14   violations [of subordinates] and failed to act to prevent them." *Preschooler II v. Clark Cty.*

15   *School Bd. of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007) (quoting *Taylor*, 880 F.2d at

16   1045). A supervisor may be liable for implementing an unconstitutional policy or practice,

17   but only when it is "so deficient that the policy itself is a repudiation of constitutional rights

18   and is the moving force of the constitutional violation." *Redman v. Cty. of San Diego*, 942

19   F.2d 1435, 1446 (9th Cir. 1991) (internal quotations omitted). The doctrine of qualified

20   immunity insulates state officers from suits for damages unless they violate "legal rules that

21   were clearly established at the time [the action] was taken." *Pearson v. Callahan*, 555 U.S.

22   223, 244 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)).

23        Prison officials violate prisoners' Eighth Amendment rights when they demonstrate

24   "deliberate indifference to serious medical needs of prisoners." *Jackson v. McIntosh*, 90 F.3d

25   330, 332 (9th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff

26   shows that he had a "serious medical need" when "the failure to treat a prisoner's condition

27   could result in further significant injury or the unnecessary and wanton infliction of pain."

28

*Doty v. County of Lassen*, 37 F.3d 540, 546 (internal quotations omitted). Prison officials are deliberately indifferent to such a need when they "deny, delay, or intentionally interfere with medical treatment." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Hutchinson v. U.S.*, 838 F.2d 390, 392 (9th Cir. 1988)).

A prison official is not deliberately indifferent when a "defendant has based his actions on a medical judgement that either of two alternative courses of treatment would be medically acceptable under the circumstances." *Jackson*, 90 F.3d at 332. "A showing of medical malpractice is insufficient to establish a constitutional depravation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). On the other hand, a plaintiff need not prove that defendants completely denied access to care to show deliberate indifference, because "access to medical staff is meaningless unless that staff is competent and can render competent care." *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (quoting *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988)). In a claim alleging "'mere delay of surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the delay was harmful.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (overruled on other grounds by *WMX Tech., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

### A.    Serious Medical Need

Defendants do not argue that Plaintiff's medical needs were not serious. His back condition eventually required aggressive surgery, and he had a torn meniscus in his knee which also required surgery. (Doc. 118-6, Exs. Q, S). A reasonable jury could credit the statements of Dr. Jones that Plaintiff's eventual surgery was more serious than it would have been had he been diagnosed sooner, and that by favoring his good knee during the period in which surgery was delayed he also further injured his spine. (Doc. 118-21, Ex. FFF at 7).

### B. Deliberate Indifference

To determine whether there are genuine issues of material fact as to whether any

- 11 -

1    Defendant was deliberately indifferent to Plaintiff's serious medical needs, the acts of the

2    individual Defendants will be considered in turn.

3                        **1.    Price**

4         Price did not move for summary judgment. Defendants have submitted a motion for

5    joinder asking that Price join the other Defendants in their motion. Even were he allowed to

6    join the other Defendants in their original motion, Price is nowhere mentioned in that motion

7    or in the accompanying statement of facts. Price has not "met [his] burden of coming forward

8    with proof of the absence of any genuine issues of material fact." *Celotex*, 477 U.S. at 322

9    (internal quotations omitted). He is not entitled to summary judgment.

10                        **2.    Martinez**

11        Martinez served as an appeals officer at PVSP, and screened out some of Pogue's

12   appeals on procedural grounds, which Pogue alleges were faulty. (Doc. 116 ¶ 124). Because

13   parties disagree as to whether appeals officers can be liable as a matter of law for failing to

14   act on an appeal, some discussion of the issue is required.

15        Prisoners have no Fourteenth Amendment liberty interest in a right to appeal adverse

16   decisions by prison authorities. *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988)

17   ("There is no legitimate claim of entitlement to a grievance procedure."). In *Ramirez v.*

18   *Galaza*, 334 F.3d 850, 860 (9th Cir. 2003), the Ninth Circuit confirmed that a prisoner may

19   not challenge an administrative disciplinary appeals process on Due Process grounds,

20   confirming that "inmates lack a constitutional entitlement to a specific prison grievance

21   procedure."

22        The Ninth Circuit has not ruled on whether, in a prison that provides a grievance

23   process, a prisoner may state a valid Eighth Amendment claim against an individual prison

24   official who hears and denies an appeal in that process. The district courts are divided on the

25   question even within the Eastern District of California. At least one decision in the Eastern

26   District, relying on *Ramirez* and *Mann*, reasoned that no constitutional claim of any sort may

27   be based upon the administrative appeals process. In *Martin v. Tilton*, 2008 WL 4454045,

28                                   - 12 -

1   at *5 (E.D. Cal. Sep. 30, 2008), the court dismissed an Eighth Amendment complaint

2   predicated upon the fact that prison officials had denied a grievance, writing "to the extent

3   [plaintiff] asserts that [defendants] are liable because they participated in the handling of his

4   inmate grievances, he cannot state a claim upon which relief can be granted."

5        Other district courts have disagreed, at least regarding Eighth Amendment complaints

6   against medically-trained officers who deny appeals requesting specific care. *See, e.g.*,

7   *Coleman v. Adams*, 2010 WL 2572534 (E.D. Cal. June 22, 2010); *Arreola v. Dudley*, 2010

8   WL 3033806 (E.D. Cal. July 30, 2010); *Herrera v. Hall*, 2010 WL 2791586 *4 (E.D. Cal.

9   July 14, 2010). These courts have generally reasoned that, although *Ramirez* and

10  *Mann* prohibit Due Process claims regarding the handling of appeals, they  "do not touch

11  upon whether an appeal reviewer's actions can be considered 'cruel and unusual' within the

12  meaning of the Eighth Amendment." *Coleman*, 2010 WL 2572534, at *7. In *Coleman*, the

13  district court reasoned that the plaintiff's reference to his administrative appeal (in that case,

14  for a request for a lower bunk and pain medication needed to treat previous injuries) "merely

15  bolsters his allegation that supervisory personnel had actual awareness of the risk to

16  Plaintiff's safety."

17       Of particular note are cases in which plaintiffs have filed administrative appeals

18  requesting particular medical treatment for particular ailments. In *Arreola*, a patient who had

19  been diagnosed with Hepatitis C was transferred to a new prison, and then was told by a

20  prison doctor there that he did not have the disease. He filed an appeal, which the same

21  doctor rejected; the court found that the doctor could be liable because "constitutional

22  violations are not shielded from liability because they occur in part within the context of an

23  administrative interview." *Arreola*, 2010 WL 3033806, at *4. In another Hepatitis C case,

24  the district court found that an appeals reviewer who was medically trained but not the

25  original treating physician could also be liable under the Eighth Amendment, so long as that

26  reviewer "had the authority and opportunity to prevent the ongoing violation," because in

27  such a case "a plaintiff may be able to establish liability by alleging that the appeals

28

1  coordinator knew about an impending violation and failed to prevent it." *Herrera*, 2010 WL

2  2791586, at *4 (E.D. Cal. July 14, 2010) (citing *Taylor*, 880 F.2d at 1045). The emerging

3  consensus, therefore, is that a medically-trained official who reviews and denies an appeal

4  is liable under the Eighth Amendment when a plaintiff can show that the official knew, at

5  least in part, from reading the appeal that the plaintiff had a serious medical issue and

6  nevertheless chose not to offer treatment. *See Sevilla v. Terhune*, 2009 WL 1211393, at *6

7  (E.D. Cal, 2009) (plaintiff "will likely also be able to state a cognizable claim against

8  defendants with medical training if they reviewed and ruled against Plaintiff in his medical

9  grievances/appeals on that same issue").

10     Plaintiff cites no court within the circuit, however, that has extended this liability to

11  non-medical prison staff tasked with reviewing appeals. Instead, non-medical reviewers who

12  confirm that a prisoner is receiving some medical treatment "will generally be justified in

13  believing that the prisoner is in capable hands." *Wilson v. Woodford*, 2009 WL 839921, at

14  *7 (E.D. Cal. Mar. 30, 2009) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). In

15  *Wilson*, although the court allowed claims against medical reviewers to continue, it wrote that

16  the plaintiff "cannot establish a triable issue of fact against any of the non-medical

17  defendants . . . who reviewed and ruled against him on his inmate appeals on medical issues."

18  *Wilson*, 2009 WL 839921, at *7.

19     Plaintiff does not claim that Martinez was medically trained or authorized to order

20  treatment. Summary judgment is thus granted to Defendant Martinez.

21     **C.    Dr. Igbinosa**

22     Dr. Igbinosa reviewed Plaintiff's appeals, had the authority to offer diagnostic

23  treatment such as an MRI, and chose not to do so. (Doc. 118-3, Ex. G-2, 196:17–24). Dr.

24  Igbinosa stated that he did not order an MRI because Plaintiff did not request an MRI in his

25  appeal, but rather asked to see a doctor regarding his back pain, and he had in fact been seen

26  by a doctor recently. (*Id.* at 191–98). Nevertheless, a reasonable jury could determine that

27  based on Plaintiff's medical records and his appeal, Dr. Igbinosa ought to have ordered the

28                                          - 14 -

1    MRI. There exist genuine issues of material fact as to whether Dr. Igbinosa violated

2    Plaintiff's constitutional rights.

3        Dr. Igbinosa, however, is entitled to qualified immunity. State officers sued under

4    Section 1983 are entitled to qualified immunity unless they violate "legal rules that were

5    clearly established at the time [the action] was taken." *Pearson*, 555 U.S. at 244. A court

6    considers whether a constitutional right was clearly established at the time of the incident "in

7    light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*,

8    533 U.S. 194, 201 (2001). To deny qualified immunity, "the right the official is alleged to

9    have violated must have been clearly established in a more particularized, and hence more

10   relevant, sense: the contours of the right must be sufficiently clear that a reasonable officer

11   would understand that what he is doing violates that right." *Brosseau v. Haugen*, 543 U.S.

12   194, 199 (2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although a

13   plaintiff need not show that "the very action in question has previously been held unlawful,"

14   qualified immunity is appropriate unless "in light of pre-existing law the unlawfulness [is]

15   apparent." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006).

16       It is true that a right may be clearly established absent a prior case on identical facts,

17   but there must be some case that provides the official with "'fair warning' that his conduct

18   was unlawful." *Herrera v. Phoenix Police Chief*, 2009 WL 197133, at *3 (Jan. 28, 2009)

19   (quoting *Kennedy*, 439 F.3d at 1065). Plaintiff has not pointed to any case prior to 2009

20   holding that any appeals officers, even those with medical training, can be liable under the

21   Eighth Amendment for denying appeals. Dr. Igbinosa's actions took place in 2006 and 2007,

22   at which point *Ramirez* and *Mann* could have suggested to him, as they suggested to the

23   district court in *Coleman*, that no constitutional liability could stem from appeals review. *Cf.*

24   *Martinez-Medina v. Holder*, ___ F.3d ___, 2011 WL 855791, at *6 (Mar. 11, 2011) ("[A]

25   reasonable officer could have been confused by these statements in [prior cases]—and for

26   that reason, the error was not 'egregious'"). Dr. Igbinosa is entitled to qualified immunity for

27   his review of Plaintiff's appeals.

28

- 15 -

Plaintiff also contends that Dr. Igbinosa is liable for implementing policies that led to inadequate treatment. (Doc. 115 at 21–22). For such a policy to rise to the level of a constitutional violation, it must be "so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Redman*, 942 F.2d at 1446 (prison policy of housing prisoner classified as "young and tender" by prison officials in cell with prisoner incarcerated for sexual assault who had been classified as an "aggressive homosexual" by prison officials created liability for subsequent rape). Plaintiff here argues that Dr. Diep did not know how long it would take for an inmate to receive a specialty appointment categorized as routine, and that the policy of rotating which doctors' saw patients for scheduled appointments diluted doctors responsibility towards individual patients. (Doc. 115 at 21–22). Diep's failure to learn PVSP procedures does not suggest that there was a policy not to teach such procedures. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (internal quotations omitted) ("[A]bsent evidence of a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be classified as negligence.'"). Plaintiff presents no evidence that Dr. Igbinosa implemented a policy that is a "repudiation of constitutional rights." *Redman*, 942 F.2d at 1446. Dr. Igbinosa is thus entitled to summary judgment.

## C.    Warden Yates

Plaintiff alleges that Yates is liable for failing to respond to his appeals; since Yates was not medically-trained, he is entitled to summary judgment on these claims. *See Wilson*, 2009 WL 839921, at *7. Yates's general responsibility for overseeing the prison through various Operational Procedures likewise would give rise only to *respondeat superior* liability, which is not cognizable under Section 1983. Yates's attitude towards previous class action litigation involving medical care at PVSP and the California prison system generally, along with his statements about the Federal Receiver, are simply not relevant to his responsibilities towards Plaintiff. He is entitled to summary judgment for claims regarding Plaintiff's lack of treatment for his knee and back.

Plaintiff also claims that Yates is liable for implementing a policy whereby mobility vests were confiscated from those who did not have accommodation chronos specifically authorizing the vests. The policy was implemented when prison officials became aware that some prisoners who did not have authorization for the vests had obtained them from prisoners who were transferred or paroled. (Doc. 118-12, Ex. PP-2 at 148–49). Any injury caused to Plaintiff as a result of being forced to be on the floor during alarms was not caused by the policy of removing vests from those who did not have accommodation chronos authorizing the vests. It was caused by Plaintiff not having such an accommodation chrono if he indeed deserved one. Plaintiff does not dispute Warden Yates's testimony that "When the medical chrono is given to them, they are immediately given a vest. It's not like they get it a week or two later, they get it instantly." (Doc. 118-12, Ex. PP-2 at 149:7–10). Yates is entitled to summary judgment.

### D.   Ahlin

Plaintiff alleges that Ahlin is also liable for the vest confiscation policy, which he helped develop. As noted above, any harm that Plaintiff suffered from not having a vest was the result of his not having an accommodation chronos that he deserved, not the result of the policy, so Ahlin is entitled to summary judgment on this count.

Plaintiff also alleges that Ahlin is liable for denying a transfer to Plaintiff when he requested one prior to his surgery in order to be housed in a facility nearer to the surgery site where he could obtain necessary post-surgery physical therapy. (Doc. 115 at 19–20). In his June 6 application for a transfer, Plaintiff requested that he be "placed in a medical prison suited to effectively assist in my rehab." (Doc. 118-9, Ex. BB at APP 000032). The decision was denied Dr. Phi and approved by Ahlin, based upon the following grounds: "Medical condition for transfer: HIV, Cancer, severe OPD/asthma needing oxygen tank." (*Id.* at APP 00033).

Plaintiff contends that the cited reasons are not proper grounds for denying a transfer for physical therapy. In support, he offers a California Division of Corrections provision

1   stating that inmates may be transferred for physical therapy "on an 'med and return' basis to

2   an institution that can provide the physical therapy services." (Doc. 118–16, Ex. UU).He

3   suggests that Dr. Phi instead relied on the grounds for transferring patients in response to a

4   Valley Fever outbreak at the prison, which were circulated to prison staff in 2005. (Doc. 118-

5   9, Ex. CC at 000897). Plaintiff claims that by denying his medical transfer request on

6   grounds applicable only to the Valley Fever outbreak, Dr. Phi and Ahlin showed deliberate

7   indifference to his serious medical needs. Although Plaintiffs do not allege that Ahlin was

8   medically trained, as the ADA officer of the prison, he could have taken action and ordered

9   the transfer.

10      Nevertheless, like Dr. Igbinosa, Ahlin is entitled to qualified immunity. In 2007, it

11   was not clearly established that non-medical prison personnel could be liable for violating

12   an inmates' Eighth Amendment rights by approving a denial made by a doctor during the

13   appeals process. Summary judgment is thus granted to Ahlin.

14      **E.      Dr. Diep**

15      Dr. Diep arrived at PVSP in September of 2006 and saw Plaintiff on October 12. On

16   that date, he became aware that Plaintiff had undergone back surgery a little over a year

17   before, had been complaining of lower back pain for several months, and had not received

18   an MRI or had one scheduled. (Doc. 118-6, Ex. I). Dr. Diep did not order an MRI for

19   Plaintiff's back, according to his deposition, because "a lot of people always have back pain

20   and always have straight to their legs [*sic*]." (Doc. 118-4, Ex. H-1 at 140:2–4). He noted that

21   Plaintiff had an appointment scheduled with neurosurgery, but such an appointment would

22   not be honored until an MRI had been performed, and Dr. Diep did not order an MRI. Dr.

23   Diep prescribed pain medication. He refilled the medication later, once renewing a thirty-day

24   prescription two days after he had done so because, as he admitted, he took no effort to keep

25   track of patients or prescriptions. He only scheduled an MRI after the neurosurgery

26   appointment had been cancelled, in January 2007. The MRI on Plaintiff's back was not

27   performed until May 4, 2007.

28

1    Months later, after Plaintiff had filed multiple appeals asking for treatment for his

2    back, and after an MRI on his knee had confirmed that it was injured, Dr. Diep again saw

3    Plaintiff, and this time denied him a mobility vest because, in Dr. Diep's opinion, "he can get

4    down slowly." (Doc. 118-8, Ex. Z). At this point, an MRI had been performed on Plaintiff's

5    lower back, but Dr. Diep could not remember if he reviewed the results before determining

6    that Plaintiff could get down. Dr. Diep apparently believed that if an inmate can sit on a

7    bench, he does not require a mobility vest, and the memo from Warden Yates supports this

8    view. It is not clear from the record whether inmates are required to get all the way to the

9    floor, or merely to a sitting position, during prison alarms. Dr. Diep, however, asserted

10   during his deposition that a patient does not require a mobility vest if he can get down even

11   if it takes the inmate "one day, two days, I don't know" to do so. (Doc. 113, Ex. B at

12   235:12–15). A reasonable jury could conclude that prison officials would not be satisfied

13   with an inmate's compliance during an alarm if the inmate took over twenty-four hours to

14   get to the proper position, whether seated or prone.

15   Defendants state correctly that Dr. Diep was "not Pogue's primary care physician" and

16   that Pogue had relatively few personal visits with Dr. Diep. (Doc. 120 at 3). There is no

17   requirement that a doctor see a patient frequently, or be designated as a primary care

18   physician, in order to be liable under the Eighth Amendment. Rather, a patient must have a

19   serious medical need, and the doctor must be deliberately indifferent to that need. A

20   reasonable jury could conclude that Dr. Diep relied upon his preconceived notions that

21   prisoners seek pain medication that they do not need, rather than Plaintiff's medical history

22   and the results of his exam, in deciding on a course of treatment. Dr. Diep did not order an

23   MRI when he could have. Although Dr. Diep did not "intentionally interfere" with medical

24   treatment, there is a genuine issue of material fact as to whether his failure "den[ied] or

25   delay[ed]" the MRI, and as a result, the surgery. *See Jett*, 439 F.3d at 1096. (Doc. 118-6, Ex.

26   P). A reasonable jury could also conclude that Dr. Diep was deliberately indifferent to

27   Plaintiff's serious medical needs when he denied Plaintiff an accommodation chrono that

28                                                    - 19 -

1   would have entitled Plaintiff to a mobility vest based upon the fact that Plaintiff could get

2   down, even if it took a day or two to do so. Likewise, there are genuine issues of fact as to

3   whether being forced to get down during the alarms aggravated Plaintiff's condition.

4       Summary judgment as to Dr. Diep, both for his delay in obtaining an MRI for

5   Plaintiff, and his failure to provide an accommodation chrono for him, is denied.

6                                  **CONCLUSION**

7       Defendant Martinez is not medically trained and did not have the power to grant

8   medical treatment, and therefore cannot be liable under the Eighth Amendment for denying

9   Plaintiff's appeals. Defendant Igbinosa is medically trained and could have ordered an MRI,

10  and therefore could have violated Plaintiff's Eighth Amendment rights if the appeals

11  provided Dr. Igbinosa with knowledge that Plaintiff suffered a serious medical condition. Dr.

12  Igbinosa, however, is entitled to qualified immunity on such claims because it was not clearly

13  established in 2006 or 2007 that an official could deprive an inmate of his Eighth

14  Amendment rights by affirming the denial of medical services in an appeals process. Nor was

15  Igbinosa's supervision of the medical staff so inadequate as to give rise to a constitutional

16  claim. Warden Yates is not liable for his handling of appeals because he was not medically

17  trained. Neither Yates nor Ahlin is liable for the policy of confiscating mobility vests from

18  prisoners without accommodation chronos, because Plaintiff was injured, if at all, by not

19  having a chrono, not by the policy. Ahlin is protected by qualified immunity from liability

20  for affirming the denial of a request to transfer.

21      Price did not initially move for summary judgment, and, in attempting to later join the

22  motion failed to point out why there are no issues of material fact with respect to the claim

23  against him. A reasonable jury could conclude that Dr. Diep failed to order the MRI and

24  failed to provide Plaintiff with an accommodation chrono because of his deliberate

25  indifference to Plaintiff's medical needs, and claims against him therefore survive.

26      **IT IS THEREFORE ORDERED:**

27      1.    Defendants' Motion for Summary Judgment (Doc. 112-1) is **granted in part**

28                                       - 20 -

**and denied in part**.

2.     Summary Judgment is **granted** in regards to all claims against Martinez, Dr. Igbinosa, Ahlin, and Yates, and these Defendants are dismissed from this lawsuit.

3.     Summary Judgment is **denied** as to Defendant Dr. Diep in all regards.

4.     Defendant Price, who did not properly move for summary judgment, remains a party to this litigation.

DATED this 22nd day of February, 2012.

A. Murray Snow
_____
G. Murray Snow
United States District Judge

- 21 -